**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 13 |
| FRANK J. BADOLATO, JR., | : | |
| | : | Case No. 19-15203-AMC |
| DEBTOR | : | |
| | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

**I.    INTRODUCTION**

The debtor in the above captioned bankruptcy case, Frank J. Badolato, Jr. ("Debtor"), seeks to avoid a judgment lien entered on April 23, 2009, by the Court of Common Pleas of Bucks County, Pennsylvania ("Judgment Lien"), in favor of Renaissance Recovery, LLC, ("Renaissance," together with Debtor, "Parties"), in the amount of $13,172.77,[1] pursuant to 11 U.S.C. § 522(f). Upon request of the Parties, the Court conducted a Zoom hearing on May 31, 2022 ("Zoom Hearing"),[2] at which time the Parties presented testimony and evidence with respect to the value[3] of the property securing the Judgment Lien. As set forth below in the Court's findings of fact and conclusions of law, the Court finds that Renaissance's Judgment Lien impairs the Debtor's exemption in the Debtor's residential real property and therefore, will be avoided in its entirety.

---

[1] As mentioned *infra*, the Judgment Lien was originally entered in the amount of $8,131.89, in favor of Claims Recovery Systems, Inc., the original plaintiff, and thereafter assigned, on May 24, 2019, to Renaissance Recovery, LLC. *See Claims Recovery Sys. v. Badolato, Jr.*, Case No. 2009-04319, (C.C. Bucks Cnty. Apr. 23, 2009). The additional $5,040.88 of the claim constitutes accrued interest. *See* Claim 11-1 at 4.
[2] A transcript of the Zoom Hearing is available at ECF 146.
[3] In this case, for purposes of § 522, "value" means fair market value as of the date of the filing of the petition. *See* 11 U.S.C. § 522(a)(2).

Page **1** of **20**

## II.    FACTS AND PROCEDURAL BACKGROUND

### A. Background

The Debtor currently owns and resides at 780 Third Avenue, Bristol, Pennsylvania, 19007 ("Property"). Hrg. Tr., *In re Badolato*, No. 19-15203, (Bankr. E.D. Pa. May 31, 2022) ECF No. ("ECF") 146 at 6:17-20, 8:6-10, 9:9-11. He originally purchased the Property on October 23, 2015, for $65,000, at which time he granted a mortgage in favor of Grace L. Laughlin, an individual, in the amount of $55,000 ("Mortgage"), against the Property. Ex. D-3, ECF 142 Ex. 3 at 1; Hrg. Tr., ECF 146 at 9:9-11, 10:4-25.

On August 20, 2019, the Debtor filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code ("Petition Date"). ECF 1. Shortly thereafter, on September 23, 2019, concurrently with the filing of an initial chapter 13 plan ("Initial Plan"), the Debtor filed his initial Schedules A/B – J, listing the fair market value of the Property at $92,900.00. ECF 17; ECF 18 at 3. In addition to the Mortgage in the amount of $55,000.00, the Debtor's initial Schedule D reflected only one other claim secured by the Property, a tax lien held by the Bucks County Tax Claim Bureau ("Tax Lien"). ECF 18 at 11. As reflected in the proof of claim filed by the Bucks County Tax Claim Bureau on October 9, 2019, its claim was for "delinquent county, municipal, and school real estate taxes" for the years 2016, 2017, and 2018, plus interest, in the amount of $20,643.03 as of the Petition Date. Claim 8-1 at 1. Importantly, at the time the Initial Plan was filed, the Debtor's initial Schedules neither mentioned, nor did the Initial Plan provide for any distributions toward the Judgment Lien. *See* ECF 17; ECF 18.

After a series of amended Schedules and three amended chapter 13 plans were filed,[4] none of which ever referenced the Judgment Lien, the Debtor's fourth amended chapter 13 plan

---

[4] *See generally* ECF 28, 29, 34, 71, 72, 73, 77, 82.

("Plan") was confirmed on January 19, 2021 ("Confirmation Date") and provided for total distributions on the Tax Lien in the amount of $25,929.08 purportedly attributable to the application of 9% annual interest accrued over the life of the Plan. ECF 83 at 3; ECF 100. However, more than a year after confirmation, on February 16, 2022, Debtor's counsel received a phone call from Keystone Credit Services ("Keystone"), acting as agent for Renaissance, inquiring about the Judgment Lien and "notifying Debtor's counsel that the creditor did not receive notice of the Debtor's Bankruptcy [sic] filing." ECF 121 ¶¶ 5, 8; ECF 131 ¶ 10. That same day, the Debtor filed: (1) an amended Schedule E/F, listing Claims Recovery Systems, Inc., the original plaintiff which obtained the Judgment Lien, as holding a nonpriority unsecured claim in the amount of $8,131.89, describing the claim as a "judgment lien from 2009 to be avoided," and listing Keystone as a party to receive notice regarding the same; (2) an amended Schedule C, increasing the Debtor's claimed exemption in the Property to $17,257.00, pursuant to § 522(d)(1); and (3) a "Motion of Debtor for an Order to Avoid and Disallow Liens [sic]" ("Motion"), requesting that the Judgment Lien be avoided and disallowed, contending that the Judgment Lien impairs the Debtor's exemption in the Property, such that it is effectively wholly unsecured and should be avoided pursuant to 11 U.S.C. § 522(f). ECF 119 at 2, 4; ECF 120 at 1; ECF 121 ¶ 18.

Thereafter, on April 4, 2022, Renaissance filed a proof of claim reflecting a secured debt of $13,172.77. *See* Claim 11-1 at 2. The Parties do not appear to dispute that the amount owed pursuant to the Judgment Lien as of the Petition Date is $13,172.77. *See* Hrg. Tr., ECF 146 at 5:19-20 (no objections from Debtor with respect to the validity or amount owed pursuant to the Judgment Lien). The attachments to Renaissance's proof of claim show that the Judgment Lien was entered on April 23, 2009, by the Court of Common Pleas of Bucks County, Pennsylvania,

in the amount of $8,131.89, in favor of Claims Recovery Systems, Inc. *See* Claim 11-1 at 4-6. On May 24, 2019, the claim was subsequently assigned to Renaissance, and as evidenced by the proof of claim, the additional $5,040.88 constitutes the interest accrued as of the Petition Date. *See id.* at 4-5. Additionally, Renaissance's proof of claim valued the Property at $120,000. *Id.* at 2. The same day it filed its proof of claim, Renaissance filed its answer to the Motion, opposing the Debtor's request to avoid the Judgment Lien, asserting that the value of the Property "exceeds the total amount of other secured debts and the exemption."[5] ECF 131 ¶ 11.

### B. Debtor's Property

The Property is a one-thousand twenty-four (1,024) square foot ("sq. ft."), two-bedroom, one-bathroom row home, situated on a corner lot adjacent to Bristol Pike ("Route 13"), a divided four-lane highway. Ex. C-3, ECF 143 Ex. C-3 at 10, 11[6]; Ex. D-2, ECF 142 Ex. 2 at 4.[7] Large portions of the Property—both internal and external—are and have been in need of repair from the time the Debtor purchased the Property. Hrg. Tr., ECF 146 at 12:19-13:11; Ex. D-2, ECF 142 Ex. 2 at 3. The Property was originally built as a residential row home; however, it was apparently later rezoned for commercial use. Hrg. Tr., ECF 146 at 55:10-14. As a result of the expansion, the Commonwealth seized a right-of-way from the Property to construct a sidewalk.[8] Ex. D-2, ECF 142 Ex. 2 at 3; Hrg. Tr., ECF 146 at 13:13-14:1. Prior to purchasing the Property in October 2015, the Debtor lived next door with his father, at 782 Third Avenue, Bristol, Pennsylvania 19007, which his father owned until 2018. Hrg. Tr., ECF 146 at 9:9-10:1, 18:8-14.

---

[5] Even though Renaissance appears to misunderstand that the Debtor's motion for modification was brought under § 522(f), and not pursuant to § 506(a), as limited by § 1322(b), its argument with respect to the value of the Property is nonetheless properly framed. *See* ECF 131 ¶ 15; Hrg. Tr., ECF 146 at 47:23-48:8, 73:25-74:9.
[6] All citations to Exhibits C-1 through C-3, located at ECF 143, utilize the pagination of the ECF system.
[7] All citations to Exhibits D-1 through D-12, located at ECF 142, utilize the pagination of the ECF system.
[8] It is unclear when the Commonwealth seized the right-of-way, but it appears reasonably certain that it occurred sometime around the Petition Date and therefore would factor into any valuation. Hrg. Tr., ECF 146 at 13:3-18, 20:23-25.

Notably, the Debtor attempted to make repairs to the exterior of the Property before he purchased it because the Property's condition was such that he believed it was depreciating the value of his father's house at that time. *Id.* at 11:21-12:4.

### i. Debtor's Self-Appraisal

The Debtor explained that he originally purchased the Property in 2015 for $65,000. Hrg. Tr., ECF 146 at 10:4-20. When the Debtor purchased the Property in 2015, he "gutted" the inside because the Property was a "disaster." *Id.* at 11:21-12:12. The Debtor did not otherwise elaborate on his exact intent behind attempting to renovate the Property at that time, but when he was diagnosed with cancer in 2016, he became unable to complete the renovations. *Id.* at 12:5-18. However, even before purchasing the Property, the previous owner purportedly replaced windows, but the Debtor still observed potential issues with the Property's exterior brick, foundation, and windows.[9] Ex. D-11, ECF 142 Ex. 11; Hrg. Tr., ECF 146 at 12:19-13:8, 14:16-25, 21:9-12, 37:7-9. The Debtor further claims that the continued shifting of the Property's foundation has resulted in needing to perform repairs, and that the foundation problems have not yet been corrected. Hrg. Tr., ECF 146 at 20:16-21.

The Debtor presented photographic evidence of the condition of the Property as of the Petition Date.[10] The photographs make clear that, as of the Petition Date, bricks in the exterior

---

[9] The Debtor testified that, prior to filing his bankruptcy petition, he owned and operated a general contracting business for a "couple decades" and worked as a mason for thirty years, and through that experience he formed the opinion that the Property's foundation has been negatively affected by passing trucks on Route 13. Hrg. Tr., ECF 146 at 38:23-40:1. However, the Debtor was not subject to any *voir dire* before offering his opinion testimony. Therefore, he is not properly qualified to offer expert testimony with respect to the condition of the foundation of the Property, and his opinions as to the existence and cause of possible foundation problems cannot carry the weight of an expert. *See Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 227 (3d Cir. 2008) (requirements of Fed. R. Evid. 701 & 702 and Fed. R. Civ. P. 26 do not permit proffer of an "expert in lay witness clothing"). *See also* Fed. R. Evid. 701 advisory committee's notes on 2000 amendments. Nevertheless, his opinions and observations as an ordinary homeowner, with respect to the existence of cracks, gaps, and other conditions in existence at the Property as of the Petition Date, may be considered to the extent such conditions would concern any ordinary homeowner.

[10] The Debtor indicated that all the photos he took and submitted into evidence were taken recently but, unless otherwise indicated, were nevertheless representative of the condition of the Property as of the Petition Date. Hrg. Tr., ECF 146 at 35:9-14.

structure of the Property were cracking, becoming loose, and requiring extensive repairs. Ex. D-5, ECF 142 Ex. 5; Ex. D-6, ECF 142 Ex. 6; Ex. D-7, ECF 142 Ex. 7; Hrg. Tr., ECF 146 at 20:16-22:18, 28:3-7. The foundation and exterior bricks were riddled with cracks and gaps, which reveal a history of failed repairs and worsening structural conditions. Ex. D-5, ECF 142 Ex. 5; Hrg. Tr., ECF 146 at 20:16-22:18.

In the Debtor's pictures, an exterior door to the Property was shifted, such that it created a noticeable gap between the exterior brick and the lintel. Ex. D-7, ECF 142 Ex.7; Hrg. Tr., ECF 146 at 28:18-29:9. According to the Debtor, this gap at the lintel was due to the shifting of the Property's foundation. Hrg. Tr., ECF 146 at 28:18-29:13. The Debtor further claims that shingles have been falling from the roof regularly, and that the Property has needed a new roof since he purchased it in 2015; but he has been unable to complete any roof repairs because he (1) was diagnosed with cancer in 2016 and (2) no longer operates his construction business. Ex. D-8, ECF 142 Ex. 8; Ex. D-9, ECF 142 Ex. 9; Hrg. Tr., ECF 146 at 29:18-30:19, 31:25-33:4. However, as of the Petition Date, the Debtor was able to replace a second-story window and several cracked bricks on the exterior, but unable to complete needed flashing around at least one window, or address what he considers to be significant issues with the foundation. Ex. D-9, ECF 142 Ex. 9; Hrg. Tr., ECF 146 at 33:5-34:9, 36:8-11.

Regarding the interior of the Property, as of the Petition Date, the kitchen was completely demolished, having no walls, fixtures, or appliances, rendering that room unable to functionally operate as a kitchen. Ex. D-12, ECF 142 Ex. 12; Hrg. Tr., ECF 146 at 38:10-19. When asked to offer an opinion on the value of the Property, the Debtor explained that his father's property, situated next-door, sold in 2018 for $85,000. Hrg. Tr., ECF 146 at 48:25-49:8. As his father's property was not undergoing renovation and was in much better condition than the Property, the

Debtor concluded that the value of the Property must be less than $85,000, but otherwise offered no precise figure.[11] *Id.* at 49:1-8.

### ii. Renaissance's Appraisal

Renaissance offered an appraisal prepared on April 21, 2022, by expert witness Mr. Kevin J. Ryan ("Mr. Ryan"), in opposition to the Debtor's self-appraisal, retrospectively valuing the Property as of the Petition Date ("Appraisal"). Ex. C-3, ECF 143 Ex. C-3 at 2; Hrg. Tr., ECF 146 at 54:15-19. In conducting his Appraisal, Mr. Ryan, *inter alia*, reviewed a Comparative Market Analysis ("CMA"), dated September 5, 2019, provided by the Debtor, to ascertain the condition of the interior of the Property, inspected the exterior of the Property, visited the Borough Zoning office to confirm historical use and applicable zoning restrictions, and inspected the exteriors of multiple comparable properties. Ex. D-2, ECF 142 Ex. 2 at 3; Ex. C-3, ECF 143 Ex. C-3 at 2; Hrg. Tr., ECF 146 at 54:20-5. Based upon the exterior dimensions of the building, Mr. Ryan determined that the Property is 1,188 sq. ft., despite tax records and the CMA indicating the Property was only 1,024 sq. ft. Ex. C-3, ECF 143 Ex. C-3 at 11. Mr. Ryan noted the Property rests on a 0.08-acre lot. *Id.* at 10.

According to the CMA, and largely consistent with the Debtor's testimony, the first floor had no kitchen, no ceilings, signs of water penetration at the front and rear windows, and only partially completed walls and flooring. Ex. D-2, ECF 142 Ex. 2 at 3. Moreover, there was exposed plumbing from the second-floor bathroom that could be seen on the first floor, in need of replacement. *Id.* On the second floor, one bedroom had exposed wires protruding from the ceiling and did not have a door, while the second bedroom needed framing, walls, and a ceiling. *Id.* Likewise, the exterior of the Property displayed a roof in need of replacement and multiple

---

[11] The Debtor has, however, represented the value of the Property as being $92,900.00 in both his initial, and amended, Schedule A/B. ECF 18; ECF 71.

Page **7** of **20**

holes in the soffit at various locations. *Id.* However, Mr. Ryan was able to inspect the exterior of the Property from the sidewalk and, in doing so, concluded that the condition of the exterior of the Property showed normal disrepair for a building of similar age to the Property. Hrg. Tr., ECF 146 at 57:12-20. Moreover, from his exterior visual inspection from the sidewalk, Mr. Ryan failed to identify any potential issues with respect to the condition of the foundation of the Property. *Id.* at 58:13-18. Accordingly, Mr. Ryan's Appraisal accounted for the necessary interior work that was needed as of the Petition Date, but, in terms of the exterior issues, only considered the need for a roof replacement and minor window problems in formulating a retrospective value for the Property. *Id.* at 57:21-58:12.

The Property was purportedly built around 1942 as a single-family residence but was later rezoned to enable commercial use as of the Petition Date.[12] Ex. C-3, ECF 143 Ex. C-3 at 11-12; Hrg. Tr., ECF 146 at 55:3-14. However, Mr. Ryan indicates that the improvements to the Property "are representative of a *legal non-conforming* use within this zoning classification" because "they do not satisfy the minimum lot size criteria" for the applicable zoning ordinance. Ex. C-3, ECF 143 Ex. C-3 at 12. As such, in Mr. Ryan's estimation, the highest and best use of the Property would be as retail commercial or office space. Ex. C-3, ECF 143 Ex. C-3 at 13-14; Hrg. Tr., ECF 146 at 59:10-12.

With respect to the valuation analysis, Mr. Ryan applied the "comparable sales methodology," an approach commonly utilized by expert appraisers and "generally accepted [as] the best evidence of market value in cases where a court must determine the value of real property." *Hawkins v. Santander Bank (In re Hawkins)*, 606 B.R. 632, 643 (Bankr. E.D. Pa.

---

[12] It is unclear precisely when the Property was rezoned, but the Property was most recently used for office space, after housing an auto tag agency office for some period of time, before it was acquired by the Debtor. Ex. C-3, ECF 143 Ex. C-3 at 12; Hrg. Tr., ECF 146 at 55:3-14.

2019) (citing *Seidle v. Sovereign Bank (In re Seidle)*, Bankr. No. 1:10-bk-01645MDF, Adv. No. 1:10-ap-00354MDF, 2013 Bankr. LEXIS 831, 2013 WL 828303, at *3 (Bankr. M.D. Pa. March 6, 2013)). In performing the comparative analysis of sales concerning similar properties, Mr. Ryan compared the sales of five commercial properties, sold in Bristol, Pennsylvania within two years of the Petition Date and adjusted the prices according to perceived differences between the Property and the relevant comparables. Ex. C-3, ECF 143 Ex. C-3 at 16-17; Hrg. Tr., ECF 146 at 64:15-16.

Ultimately, Mr. Ryan used the following five properties as comparable to the Property (collectively "Comparables"), which he determined were "most similar and meaningful" to the Property: (1) 427 Jefferson Ave. Bristol, PA 19007 ("427 Jefferson Avenue"), a 2,112 sq. ft. two-story building, measuring sixteen (16) feet by sixty-two (62) feet, with a first-floor commercial space and large rental unit on the second floor, "in average condition with older interior finishes," sold in May 2018 for $150,000; (2) 642 Beaver St. Bristol, PA 19007 ("642 Beaver Street"), a 3,660 sq. ft. light-industrial two-story building with an upstairs three-bedroom apartment, "in fair to average condition," sold in October 2017 for $285,000; (3) 115 Mill St., Bristol, PA 19007 ("115 Mill Street"), a 2,400 sq. ft. two-story, middle row storefront with a dental office on the first floor and an upstairs three-bedroom apartment, in "good condition," sold in April 2019 for $327,500; (4) 443 Mill St. Bristol, PA 19007 ("443 Mill Street"), a 1,634 sq. ft. single-story brick building, located on a prominent corner lot, in "fair condition . . . requiring total renovation," sold in July 2018 for $120,000; and (5) 401 Dorrance St. Bristol, PA 19007 ("401 Dorrance Street"), a 3,231 sq. ft. mixed-use building, with a floral shop on the first floor, and a two-bedroom apartment upstairs, "in average to good condition," sold in July 2019 for $270,000. Ex. C-3, ECF 143 Ex. C-3 at 16-20.

With respect to 427 Jefferson Avenue, Mr. Ryan provided the following net price adjustments: a 2% increase on account of the less favorable market conditions at the time it was sold; a 5% increase on account of the smaller lot size and less available parking; a 10% increase on account of the inferior exposure and frontage; a -10% decrease on account of the better physical condition of the property; and a 10% increase on account of the larger gross building area, or size. *Id.* at 22. Overall, 427 Jefferson Avenue received a 15% net price increase of $25,950 for a total net price of $175,950. *Id.*

With respect to 642 Beaver Street, Mr. Ryan made the following net price adjustments: a 4% increase on account of less favorable market conditions at the time the property was sold; a 10% decrease on account of the lot size and available parking; a 5% increase on account of the inferior exposure and frontage of the lot; and a 25% increase on account of the larger gross building area. *Id.* Overall, 642 Beaver Street received a 20% increase of $70,680 for a total of $355,680. *Id.*

With respect to 115 Mill Street, Mr. Ryan made the following net price adjustments: a -25% decrease on account of the better location of the property; a 5% increase on account of a smaller lot size and less available parking; a 10% increase on account of the inferior exposure and frontage of the lot; a 20% decrease on account of better physical condition; and a 15% increase on account of the larger gross building area. *Id.* Overall, 115 Mill Street received a net decrease of $49,125 for a total of $278,375. *Id.*

With respect to 443 Mill Street, Mr. Ryan made the following net price adjustments: a 2% increase on account of the less favorable market conditions at the time the property was sold; a 10% decrease on account of the location of the property; a 5% increase for the lot size and available parking; a 5% decrease for the more attractive design and style of the property; and a

5% increase for the larger gross building area. *Id.* Overall, 443 Mill Street received a 5% net decrease of $3,720 for a total of $116,280. *Id.*

With respect to 401 Dorrance Street, Mr. Ryan made the following net price adjustments: a 5% increase on account of the smaller lot size and less available parking; a 5% increase on account of the inferior exposure and frontage of the property; a 15% decrease on account of the better physical condition of the property; and a 20% increase on account of the larger gross building area. *Id.* Overall, 401 Dorrance Street received a 15% increase of $40,500 for a total of $310,500. *Id.*

Even though Mr. Ryan did not include any residential properties in the Comparables, he did determine that, "conversion back to residential occupancy would likely result in a lower value."[13] *Id.* at 14; Hrg. Tr., ECF 146 at 63:16-23, 64:15-17. Moreover, only 427 Jefferson Avenue was located in similar proximity to residential row homes, like that of the Property, and a number of the Comparables were freestanding structures, unlike the row-style exhibited by the Property. Ex. C-3, ECF 143 Ex. C-3 at 17-20; Hrg. Tr., ECF 146 at 64:21-65:8. However, only the net prices of 115 Mill Street and 443 Mill Street were adjusted downward, by -25% and -10%, respectively, on account of their locations; and only the net price of 443 Mill Street was adjusted down by -5% with respect to the design/style of the property. Ex. C-3, ECF 143 Ex. C-3 at 22.

Mr. Ryan also indicated that the Comparables were all commercial properties, between 500 sq. ft. and three-times larger than the Property, but he was uncertain as to whether the Comparables were renovated or whether they were merely in better condition. Hrg. Tr., ECF 146

---

[13] Despite the Appraisal report describing the use of the Property as potentially converting "back" to residential use, Mr. Ryan was aware that the Property is the Debtor's primary residence but testified that he found it difficult to believe that anyone could live in the Property because it lacked a working kitchen. Hrg. Tr., ECF 146 at 63:24-64:5.

at 63:11-65:12, 66:12-67:9. However, in his Appraisal report Mr. Ryan indicated otherwise, stating that the Comparables ranged from fair to good condition, with the lowest condition being 642 Beaver Street, which was in "fair to average condition" at the time of sale. Ex. C-3, ECF 143 Ex. C-3 at 17.

In determining the value of the Property, Mr. Ryan took the adjusted net prices of the Comparables, and after excluding the highest and lowest value indicators, averaged the price per square foot of the Comparables to obtain a unit rate of approximately $93 per square foot. *Id.* at 23. Upon applying that unit rate to the recalculated square footage of the Property (1,188 sq. ft.), Mr. Ryan concluded that, based upon his determination that the highest and best use of the Property is for commercial or office use, and despite the Property being of "below average physical condition," the retrospective fair market value of the Property as of the Petition Date is one hundred ten thousand dollars ($110,000.00). Ex. C-3, ECF 143 Ex. C-3 at 11, 14, 23.

### III. DISCUSSION

The Debtor is only entitled to avoid the Judgment Lien if the Judgment Lien impairs the Debtor's exemption in the Property, as governed by 11 U.S.C. § 522(f). While the Court affords significant weight to Renaissance's expert Appraisal, due to certain deficiencies explained *infra*, the Court finds the value of the Property to be $95,232.00. As explained more fully below, it is the Court's determination that the Judgment Lien impairs the Debtor's exemption in the Property and is hereby totally avoided pursuant to 11 U.S.C. § 522(f).

#### A. Lien Avoidance under 11 U.S.C. § 522(f)

Under 11 U.S.C. § 522(f)(1)(A), a debtor may avoid a lien if the following conditions are met: (1) there was a fixing of a lien on an interest of the debtor in property; (2) the lien impairs

an exemption to which the debtor would have been entitled; and (3) the lien is a judicial lien.[14] *In re Ober*, 613 B.R. 631, 637 (Bankr. E.D. Pa. 2020). Congress has made clear that the purpose of lien avoidance under § 522(f) is to safeguard a debtor's fresh start, by protecting the debtor's interest in their exemptions. H.R. Rep. 103-835, 52-54, 1994 WL 562232 (1994).

The parties do not contest that for purposes of § 522(f), the Judgment Lien is a judicial lien and was affixed[15] on the Debtor's interest in the Property at the time the Debtor purchased the Property, nor do they contest the appropriateness of the Debtor's claimed exemption.[16] *See generally* ECF 121; ECF 131; Hrg. Tr., ECF 146. Therefore, the only question before the Court is the penultimate inquiry of § 522(f)(1)(A); whether the Judgment Lien impairs an exemption to which the Debtor would have been entitled.

Section 522(f)(2)(A) sets forth the formula for determining the extent to which a lien impairs an exemption, providing:

> [f]or the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of — (i) the lien; (ii) all other liens on the property; and (iii) the amount of the exemption that the debtor could claim if there were no liens on the property; exceeds the value that the debtor's interest in the property would have in the absence of any liens.

11 U.S.C. § 522(f)(2)(A).

---

[14] The Bankruptcy Code defines the term "judicial lien" as any "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." 11 U.S.C. § 101(36).

[15] Under the Pennsylvania Judicial Code, "[a]ny judgment or other order of a court of common pleas for the payment of money shall be a lien upon real property on the conditions, to the extent and with the priority provided by statute or prescribed by general rule adopted pursuant to section 1722(b)…when it is entered of record in the office of the clerk of the court of common pleas of the county where the real property is situated…" 42 Pa. Cons. Stat. § 4303(a) (2022). The Judgment Lien was entered in 2009, and the Debtor acquired the Property in 2015 in the county where the Judgment Lien was entered. Neither party appears to dispute that the Judgment Lien was properly affixed to the Property.

[16] Renaissance has not asserted any objection to the Debtor's claimed exemption, despite Federal Rule of Bankruptcy Procedure 4003(d) providing "a creditor may object to a request under § 522(f) by challenging the validity of the exemption asserted to be impaired by the lien." Fed. R. Bankr. P. 4003(d).

Accordingly, should the sum of all liens[17] and the amount of the exemption under § 522(d)(1) the Debtor could claim if there were no liens on the Property, minus the value of the Property,[18] be greater than or equal to the amount of the Judgment Lien (*i.e.*, the impairment), then the Judgment Lien may be avoided in its entirety. However, should that difference prove to be less than the amount of the Judgment Lien, then the Judgment Lien is only avoided to the extent it impairs the Debtor's exemption in the Property and Renaissance shall hold a secured claim for any portion that remains.

### B. Value of the Property

Ultimately, the party seeking to avoid a lien under 11 U.S.C.S. § 522(f) bears the burden of proof by a preponderance of the evidence. *In re Pace*, 569 B.R. 264, 269 (B.A.P. 6th Cir. 2017); *Mahmud v. JTH Inv. Grp., LLC (In re Mahmud)*, Bankr. No. 08-10855-bf, Adv. No. 08-0175, 2008 Bankr. LEXIS 4632, at *12 (Bankr. E.D. Pa. Dec. 4, 2008); *In re Carminati*, Bankr. No. 98-10022-DWS, 1998 Bankr. LEXIS 1074, at *6 (Bankr. E.D. Pa. Aug. 18, 1998). The Debtor did not provide expert testimony regarding the value of the Property, but he did present a credible account of his own experiences with the Property and the sale of at least one comparable residential property, his father's house in 2018. The Debtor initially purchased the Property intent on completing renovations, but after the Debtor was diagnosed with cancer in 2016, he ceased all progress on renovations. As a result, as of the Petition Date, the Property was midway through projects that were left unfinished, significantly impairing the Property's functionality as either a residence or commercial property.

---

[17] The Judgment Lien, the Tax Lien, and the Mortgage.
[18] The Court references the value of the Property here, instead of the "Debtor's interest," because in this instance the Debtor's interest in the Property is undivided. *See* Ex. D-3, ECF 142 Ex. 3.

Specifically, the unfinished projects presented a long list of issues. There was water penetration at multiple first-floor windows,[19] and at least one window with incomplete flashing. A temporary exterior door and obvious cracks in the exterior brick were clearly visible, indicating a history of repairs to the exterior and potentially even foundation issues. The roof needed to be replaced. A full kitchen had to be installed. Exposed overhead plumbing needed to be addressed on the first floor, while one bedroom on the second floor lacked framing, walls, and a ceiling, and the other had no door and electrical wires protruding from the ceiling. While the Debtor never provided an exact retrospective fair market value, via any generally accepted appraisal methodology, his years of ownership prior to the Petition Date and credible testimony regarding the condition of the Property, both pre- and post-purchase, and his testimony regarding one comparable residential property,[20] are all sufficient to meet his burden and establish an initial reasonable fair market value somewhere within the range of $85,000 and $92,900. This value, while imprecise, is undoubtedly insufficient to secure any portion of the Judgment Lien after factoring in the Mortgage, Tax Lien, and the Debtor's exemption under section 522(d)(1). Therefore, the Debtor has satisfied his burden.

As the Debtor has met his burden, in order to protect the Judgment Lien from avoidance, Renaissance must show by a preponderance of the evidence that the value of the Property is sufficient to at least partially secure the Judgment Lien.[21] Renaissance presented a report and testimony of an expert appraiser, Mr. Ryan, who analyzed five commercial Comparables, all located in Bristol, Pennsylvania, in reasonable proximity to the Property. An expert in his field,

---

[19] This fact was not addressed at the Zoom Hearing, but was reflected in the CMA, a document which Mr. Ryan indicated was the basis for his determinations with respect to the interior of the Property. *See supra* Section II.B.ii.
[20] The Debtor's comparable residential property, his father's house, located at 782 Third Ave. Bristol, PA 19007, shares a common wall with the Property and purportedly sold for $85,000 in 2018. Hrg. Tr., ECF 146 at 18:12-17.
[21] Because the parties have agreed that the value of the Judgment Lien as of the Petition Date is $13,172.77, Renaissance need not address the extent or validity of the lien. *See supra* Section II.A.

Mr. Ryan's report carries significant weight. However, the Debtor raised certain issues with the Appraisal report with respect to three important aspects of the valuation. Specifically, the Debtor suggests that Mr. Ryan failed to: (1) appropriately adjust the net price of the Comparables, with respect to the physical condition of the improvements, in order to account for the considerable state of disrepair of the Property; (2) consider comparable residential properties in the area; and (3) utilize Comparables of similar size to the Property for purposes of the value calculation. The Court will address these in turn.

The Debtor asserted, and Mr. Ryan acknowledged, that some of the Comparables were stand-alone properties, and four of the five were indeed not located in residential areas, but no adjustments were made to the net prices of the Comparables with respect to those factors.[22] Indeed, Mr. Ryan compared no residential properties in forming his valuation. But, while the Debtor makes a relevant point, with respect to the lack of residential properties among the Comparables, he too only provided one property for the Court to consider as a basis for valuation. Because the Debtor failed to provide any other evidence in his self-appraisal with respect to comparable residential properties sold in the vicinity, on or around the Petition Date, which may have rebutted Mr. Ryan's Appraisal, the Court cannot ascribe much weight to his assertion that the Comparable properties fail to include any residential properties. This is an oversight the Debtor is equally guilty of perpetrating.

With respect to the Debtor's contention that the Appraisal failed to sufficiently account for the inferior physical condition of the Property, the Court does indeed find that all of the Comparables were in objectively better condition than the Property. Yet only the net prices of

---

[22] Mr. Ryan did make a -5% adjustment to the net price of 443 Mill Street under the category of "Design/Style." Ex. C-3, ECF 143 Ex. C-3 at 22. However, Mr. Ryan does not explain clearly in the Appraisal what this adjustment was intended to address. *See Id.*

427 Jefferson Avenue, 115 Mill Street, and 401 Dorrance Street were adjusted downward, by -10%, -20%, and -15%, respectively, due to their physical conditions. In the Court's view, despite indicating that the condition of the Property was taken into account, Mr. Ryan did not sufficiently adjust the Comparables for the obviously poor condition of the interior of the Property. Likewise, the physical conditions of the unadjusted Comparables, 642 Beaver Street and 443 Mill Street, were respectively described as "fair to average" and "fair." The Appraisal report failed to describe any similar physical conditions with respect to 642 Beaver Street that would warrant leaving its net price unadjusted. While 443 Mill Street was described as requiring a "full renovation," 642 Beaver Street was not described as lacking any walls, a kitchen, or having any signs of water penetration at the windows or exposed wiring and plumbing on the interiors, all conditions that were objectively present at the Property as of the Petition Date.

While the Court believes that Mr. Ryan should have adjusted the net price for 642 Beaver Street, at least minimally, to account for the differences of the condition, his failure to enter a minimal adjustment is not sufficient to fully invalidate the Appraisal. Furthermore, with respect to the exterior issues that the Debtor referenced, the Court finds that, because the CMA was the basis for Mr. Ryan's Appraisal, which made no mention of any potential structural issues, and Mr. Ryan was unable to observe anything in his view that would signal structural issues in his opinion, Mr. Ryan was justified in not making any adjustments in that regard.[23] In light of these factors, the Court finds the adjustments to the physical conditions of the Comparables that were made, while slightly inaccurate insofar as they equate the physical condition of the Property with

---

[23] Additionally, no evidence beyond the Debtor's opinion was presented to prove the Property had any structural issues. As mentioned *supra*, because the Debtor was not properly qualified as an expert, his opinion cannot carry the requisite weight to enable the Court to make a factual finding that the Property indeed has severe structural or foundation issues which impact the value.

642 Beaver Street, were not significant enough to invalidate the ultimate unit rate calculated by Mr. Ryan.

With respect to size, the Debtor takes issue with the fact that all five Comparables were larger in square footage by at least 500 sq. ft., and one of the Comparables was three times the size of the Property. The Court finds this difference relevant, however, Mr. Ryan ultimately made adjustments to the net price of the Comparables based on their difference in size as compared to the Property. Specifically, Mr. Ryan adjusted the net prices of the Comparables to account for the generally recognized principle that "unit sales prices typically react in an inverse relationship with the relative difference in SIZE of a property, that is, as the size [of the property] increases, the corresponding unit price usually decreases." Ex. C-3, ECF 143 Ex. C-3 at 23. The Court finds these adjustments reasonable and properly justified by the methodology applied. However, the Court finds that the *way* in which Mr. Ryan determined the sizes of the Comparables and the Property was inconsistent, such that it unreasonably increased the size of the Property based on building measurements but appeared to make no similar adjustments with respect to the sizes of the Comparables.

Based upon the exterior measurements of the Property (approximately eighteen (18)-feet by thirty-three (33)-feet by two-floors), Mr. Ryan recalculated the square footage to 1,188 sq. ft., significantly larger than the 1,024 sq. ft. size of the Property indicated in both the CMA and tax records. Ex. D-2, ECF 142 Ex. 2 at 4; Ex. C-3, ECF 143 Ex. C-3 at 11. Ordinarily, this recalculation would not raise any substantial issues with respect to an appraisal, so long as this method of recalculation is applied consistently. However, in this instance, Mr. Ryan appears to have only recalculated the size of the Property and not the Comparables. For example, 427 Jefferson Avenue, a two-story building, is described in the Appraisal report as having a "building

footprint" of sixteen (16) feet by sixty-two (62) feet. *Id.* at 17. Based on Mr. Ryan's recalculation applied to the Property, this measurement would yield a square footage of 1,984 sq. ft. for 427 Jefferson Avenue. But Mr. Ryan made no adjustment to the square footage of 427 Jefferson Avenue and provided no information with respect to the building footprints of the other Comparables.[24]

Mr. Ryan reportedly visited and examined the exteriors of all the Comparables and the Property. *See* Hrg. Tr., ECF 146 at 54:23-55:2. He therefore could have easily measured each structure and recalculated the square footage accordingly. Because he did not recalculate, or at least verify in his Appraisal the square footage reported for each Comparable,[25] the Court must disregard his recalculation of the Property. Accordingly, under these circumstances, the Court finds the adjustment to the size of the Property to be improper and unjustified and for purposes of determining value, the Court will use the square footage of the Property indicated in the CMA and the tax records – 1,024 sq. ft.[26]

Therefore, because Mr. Ryan's Appraisal value of $110,000 was based on an unjustified recalculation of the Property's square footage that does not appear to have been similarly applied to the Comparables, described *supra*, the Court finds that the appropriate value of the Property is $95,232.[27] Upon applying the formula set forth in § 522(f):

---

[24] The Court recognizes that because the net sale price of 427 Jefferson Avenue was the lowest value indicator, Mr. Ryan's failure to recalculate the square footage of that property was immaterial to the unit rate he ultimately utilized. However, that does not excuse the inconsistent application of his method of recalculating the square footage of the Property for purposes of determining value.

[25] Mr. Ryan does not indicate where he obtained the square footages for the Comparables. *See* Ex. C-3, ECF 143 Ex. C-3. However, given that he made no recalculations and provided no measurements of the building footprints for each Comparable, it is clear to the Court that Mr. Ryan did not scrutinize the sizes of the Comparables and the Property in a consistent manner.

[26] The Court further recognizes that, due to the inverse relationship between building size and price per square foot, this inconsistency, with respect to the recalculation of the Property's square footage, had the effect of *directly increasing* the value when applying the unit rate to the Property.

[27] This value was calculated by multiplying the unit rate, of $93 per square foot, identified by Mr. Ryan, by the 1,024 square footage of the Property, as indicated in the CMA and in the tax records.

| | |
|---|---|
| Amount of Judgment Lien | $ 13,172.77 |
| Amount of all other liens | $ 80,929.08[28] |
| Amount the Debtor could claim under § 522(d)(1) [29] | $ 25,150.00[30] |
| Total | $ 119,251.85 |
| Value of Property | - $ 95,232.00 |
| **Extent of impairment** | **$ 24,019.85[31]** |

Because the Debtor's exemption in the Property is impaired to a greater extent than the value of the Judgment Lien, the Judgment Lien is hereby avoided in its entirety.

IV.    **CONCLUSION**

Based on the foregoing, the Court determines that the value of the Property, as of August 20, 2019, is $95,232.00. Further, upon application of the formula provided under § 522(f)(2)(A), the Debtor's exemption in the Property is sufficiently impaired so as to avoid Renaissance Recovery's Judgment Lien in its entirety. The Debtor's Motion is hereby granted. An appropriate order follows.

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

Date: July 25, 2022

---

[28] This represents the sum of the $55,000 Mortgage and the total distributions under the Plan on account of the Tax Lien in the amount of $25,929.08.

[29] The Debtor indicated at the Zoom Hearing that the exemption that the Debtor could claim was $25,500. Hrg. Tr., ECF 146 at 72:15-9. However, as of the Petition Date, the maximum allowable homestead exemption under § 522(d)(1) was $25,150. *See* Revision of Certain Dollar Amounts, 81 Fed. Reg. 3488, 3488 (Feb. 12, 2019).

[30] Neither party appears to dispute that the full amount of the homestead exemption under § 522(d)(1) should be applied to this calculation, irrespective of Debtor's counsel's minor misstatement at the Zoom Hearing as to the correct amount, and the Court agrees pursuant to the plain language of § 522(f)(2). *See* ECF 134 at 1; Hrg. Tr., ECF 146 at 72:15-16.

[31] Alternatively, the Judgment Lien still impairs the Debtor's exemption enough to be avoided in its entirety even if this calculation is performed valuing the Tax Lien at $20,643.03. ($13,172.77+$55,000+$20,643.03+$25,150 = $113,965.80 - $95,232.00 = $18,733.80).